UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

DJ DIRECT, INC.,

                 Plaintiff,

       v.

YAAKOV N. MARGALIOT, TOVAH S.
MARGALIOT, JCB MAX LLC, JBI IMPORTS
LLC, LISSE USA LLC, and DOES 1-5,

                 Defendants.
---------------------------------------------------------------

**MEMORANDUM & ORDER**
20-CV-2477 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff DJ Direct Inc. commenced the above-captioned action on June 3, 2020, against

Defendants Yaakov N. Margaliot and Tovah Margaliot (the "Margaliots") alleging that Yaakov

fraudulently registered Plaintiff's "KaraoKing" trademark in his own name while employed for

Plaintiff. (Compl., Docket Entry No. 1.) On September 10, 2020, Plaintiff filed an Amended

Complaint adding Defendants JCB Max LLC, JBI Imports LLC, and Lisse USA LLC (the "Lisse

Defendants") and John or Jane Does 1–5 and alleging that these Defendants, with the help of the

Margaliots, have been selling Plaintiff's KaraoKing karaoke machines by relabeling them with

their "Amasing" mark and passing them off as their own. (Am. Compl., Docket Entry No. 15.)

On September 17, 2020, Plaintiff moved for a preliminary injunction pursuant to Rule 65 of the

Federal Rules of Civil Procedure and pursuant to its claims for trademark infringement and

reverse passing off under section 43(a) of the Lanham Act, 15 U.S.C. 1125(a), to enjoin

Defendants from using the KaraoKing mark and from passing off Plaintiff's products as their

own, and the Margaliots and the Lisse Defendants opposed the motion.[1]  On November 5, 2020,

the Court held a hearing on Plaintiff's motion.  (Min. Entry dated Nov. 5, 2020.)

For the reasons set forth below, the Court grants in part and denies in part Plaintiff's

motion.

## I.  Background

Plaintiff sells consumer goods "primarily through e-commerce channels such as

Amazon.com."  (Decl. of Joel Jacobowitz in Supp. of Pl.'s Mot. ("Jacobowitz Decl.") ¶ 2,

Docket Entry No. 26.)  On March 30, 2017, Plaintiff purchased the Margaliots' company

"Interest J" and hired the Margaliots to work for Plaintiff expanding its business, designing and

finding new products for it to sell, dealing with its overseas suppliers, and managing its

Amazon.com listings.  (Id. ¶¶ 6–8; Suppl. Decl. of Joel Jacobowitz in Supp. of Pl.'s Mot.

("Jacobowitz Suppl. Decl.") ¶ 6, Docket Entry No. 45.)[2]

In December of 2017, Shenzhen, a Chinese factory that had previously sold karaoke

microphones to Plaintiff, approached Yaakov regarding the sale of karaoke machines.  (Decl. of

Yaakov Margaliot in Supp. of Defs.' Opp'n ("Yaakov Decl.") ¶ 6, Docket Entry No. 42.)

Shenzhen offered Yaakov the design of the machines at issue in this case, (id. ¶ 7; Jacobowitz

Decl. ¶ 9), which uniquely incorporate several karaoke features into a single, self-contained

apparatus, including a disco ball, ceiling lights, and speakers, (Jacobowitz Decl. ¶ 11; Pl.'s Mem.

---

[1]  (Order to Show Cause for Prelim. Inj., Docket Entry No. 24; Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), Docket Entry No. 25; Shira & Tovah Margaliot Mem. in Opp'n to Pl.'s Mot. ("Margaliot Defs.' Mem."), Docket Entry No. 37; Lisse USA LLC, JCB Max LCC & JBI Imports LLC's Mem. in Opp'n to Pl.'s Mot. ("Lisse Defs.' Mem."), Docket Entry No. 39.)

[2]  "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."  *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trs. for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723, 725 n.2 (S.D.N.Y. 2019) (quoting *Park Irmat Drug Corp. v. Optumrx, Inc*., 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016)).

1–2).  Plaintiff and Shenzhen exchanged plans and drawings for the machines, (Jacobowitz Decl.

¶ 10), and Plaintiff ultimately made several design contributions, including redesigning the

function board and providing the voice recordings that users hear when they operate the

machine, (Jacobowitz Suppl. Decl. ¶¶ 19, 27).  At the Margaliots' suggestion, Plaintiff named

the products "KaraoKing."  (Jacobowitz Decl. ¶ 9.)  Plaintiff ordered the machines to be

manufactured with the KaraoKing mark permanently etched on the front, (Jacobowitz Suppl.

Decl. ¶ 30), and began selling them under an exclusivity agreement with Shenzhen, (Yaakov

Decl. ¶ 9; Jacobowitz Suppl. Decl. ¶ 33).  To date, Plaintiff has sold more than 20,000

KaraoKing machines, generating over $4,000,000 in revenue.  (Jacobowitz Decl. ¶ 11.)

### a.  Yaakov's registration of the mark

On February 25, 2018, Plaintiff paid the fees for Yaakov to register the KaraoKing

trademark.  (Yaakov Decl. ¶¶ 16–17; Jacobowitz Decl. ¶ 25.)  Although Plaintiff was the only

entity using and selling goods under the KaraoKing mark and Yaakov was Plaintiff's employee,

Yaakov represented in the application to the U.S. Patent and Trademark Office (the "USPTO")

that he was personally using the mark in U.S. commerce in connection with karaoke machines.

(Jacobowitz Decl. ¶ 25.)  On April 30, 2019, the mark was registered in Yaakov's name.

(Registration, annexed to Yaakov Decl. as Ex. C, Docket Entry No. 42-3.)

### b.  2019 shipment of karaoke machines

In June of 2019, Plaintiff ordered seventeen containers of KaraoKing machines from

Shenzhen and paid a $235,000 deposit.  (Jacobowitz Decl. ¶¶ 17–18.)  In November of 2019,

after accepting delivery of ten of the containers, Plaintiff decided that it did not require additional

inventory and instructed Shenzhen to delay manufacture of the remaining products.  (*Id.* ¶ 20;

Decl. of Johnson Xu in Supp. of Defs.' Opp'n ("Xu Decl.") ¶ 5, Docket Entry No. 41.)  Plaintiff

maintains that Yaakov knew of these instructions but told Shenzhen to continue production. (Jacobowitz Decl. ¶¶ 21–22.) In January of 2020, Shenzhen advised Plaintiff that the remaining containers were ready to be shipped. (*Id.* ¶ 23.) When asked who gave the instructions to go ahead with production, Shenzhen confirmed that Yaakov had given the instructions.[3] (*Id.*) Around this same time, Plaintiff also discovered that when Yaakov had applied to register the KaraoKing trademark in 2018, he had done so in his own name. (*Id.* ¶¶ 24–25.)

After discovering the above acts, Plaintiff terminated the Margaliots on March 5, 2020. (*Id.* ¶ 26.) Plaintiff maintains that, around this same time, it sought to acquire the balance of containers from Shenzhen to restock its inventory, but Shenzhen became unresponsive. (*Id.* ¶ 27.) Shenzhen maintains that it unsuccessfully tried to contact Plaintiff in March of 2020 via WhatsApp and email regarding the unpaid balance for the remaining containers but that Plaintiff never responded to Shenzhen's calls or emails, including a March 11, 2020 dunning letter to one of Plaintiff's employees informing Plaintiff that "without the balance payment of all [seven] containers in [two] days, . . . we will need to change the logo . . . and sell to other clients." (Xu Decl. ¶¶ 13–14; Dunning Letter, annexed to Xu Decl. as Ex. A, Docket Entry No. 41-1.)

### c.   Shenzhen's resale of Plaintiff's products to the Lisse Defendants

On March 17, 2020, Shenzhen emailed JCB Max stating that it had ended its business relationship with Plaintiff due to Plaintiff's delay in paying the balance on the seven containers of KaraoKing-branded machines and offering to change the logo on the machines and sell them to JCB Max. (Shenzhen Email to JCB Max LLC, annexed to Decl. of Avi Kraminer in Supp. of

---

[3] Yaakov maintains that he never knew that Plaintiff had instructed Shenzhen to delay manufacture of the machines and that he never gave Shenzhen contrary instructions. (Yaakov Decl. ¶ 19.) Shenzhen similarly maintains that, although Plaintiff instructed it to delay manufacture, no one ever gave it contrary instructions. (Xu Decl. ¶ 7.)

Defs.' Opp'n ("Kraminer Decl.") as Ex. A, Docket Entry 43-1.)  In addition, Shenzhen sent JCB

Max an invoice for the machines and a letter granting JCB Max the exclusive right to sell the

machines in the U.S. market.  (*Id.*)  On March 18, 2020, JCB Max purchased the seven

containers of machines.  (Kraminer Decl. ¶ 6, Docket Entry No. 43.)

On April 8, 2020, Plaintiff contacted Shenzhen regarding the remaining seven containers.

(*See* Jacobowitz Suppl. Decl. ¶¶ 44–51; Xu Decl. ¶ 18.)  As part of the discussion, Shenzhen

listed terms to continue doing business with Plaintiff and indicated "if you do not [meet] the

above points, we can not [sic] ship."  (Jacobowitz Suppl. Decl. ¶ 47; WhatsApp Messages,

annexed to Jacobowitz Suppl. Decl. as Ex. L, Docket Entry No. 45-12.)  Plaintiff agreed to pay

the balance on the seven containers but did not agree to Shenzhen's other terms.[4]  (WhatsApp

Messages.)  Plaintiff never cancelled or suggested that it wanted to cancel its order for the

products, which had already been manufactured with the KaraoKing mark.  (Jacobowitz Suppl.

Decl. ¶ 50.)

### d.  Alleged reverse passing off

In June of 2020, Plaintiff became aware of an Amazon.com listing for "Amasing"-

branded karaoke machines that looked identical to Plaintiff's KaraoKing machines.  (Jacobowitz

Decl. ¶ 31.)  After purchasing one of the machines in August, Plaintiff discovered that

Defendants were in fact selling Plaintiff's machines rebranded as their own by hot gluing a

metallic "Amasing" label directly over Plaintiff's "KaraoKing" mark.  (*Id.* ¶ 34.)

---

[4]  It appears from the portion of the conversation in the record that Plaintiff was unaware
of Shenzhen's dunning letter or the fact that Shenzhen had already resold the machines.



| Appearance of Defendants' Products as Shipped | False Nameplate Peeling Off | Appearance When False Nameplate Is Removed |

(Am. Compl. 3; Pl.'s Mem. 2.)

Plaintiff contends that the Margaliots assisted the Lisse Defendants in procuring the machines in question and executing plans to pass off KaraoKing machines under their Amasing mark. (Jacobowitz Decl. ¶ 30.) As a result, Defendants' actions left Plaintiff without inventory on a successful product, ruined Plaintiff's relationship with its supplier, and "severely impacted" Plaintiff's sales of KaraoKing machines. (*Id.* ¶¶ 35–36.) Plaintiff seeks a preliminary injunction based on its claims of trademark infringement and reverse passing off to enjoin Defendants from using the KaraoKing mark and from passing off KaraoKing products as Amasing products. (Pl.'s Mem. 3.)

## II. Discussion

### a. Standard of review

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. ---, ---, 138 S. Ct. 1942, 1943 (June 18, 2018) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008)). The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be

held." *Id.* (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). "A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010)). However, a heightened standard is appropriate where "the movant is seeking to modify the status quo by virtue of a '*mandatory* preliminary injunction' (as opposed to seeking a '*prohibitory* preliminary injunction' to maintain the status quo), or where the injunction being sought 'will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (footnote omitted) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). "Under this heightened standard, [the movant] must make a clear showing that he is entitled to the relief requested, or that 'extreme or very serious damage' will result from denial of preliminary relief." *Demirayak v. City of New York*, 746 F. App'x 49, 51 (2d Cir. 2018) (quoting *Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003)).[5]

---

[5] Relying on *North American Soccer League, LLC v. United States Soccer Federation, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018), Defendants assert that the heightened standard applies because Plaintiff is seeking a mandatory injunction that would alter the status quo, given that Defendants would be enjoined from selling the relabeled machines. (Lisse Defs.' Mem. 3, 9–10.) However, "the status quo" is not the current state of affairs but "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League, LLC*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). Therefore, the status quo in this case is the state of affairs preceding Defendants' alleged reverse

### b. Likelihood of success on the merits

The Court analyzes the likelihood of success on the merits for both Plaintiff's trademark infringement claim and its reverse passing off claim.

### i. Trademark infringement claim

Plaintiff alleges that Defendants' sale of machines bearing the covered-up KaraoKing mark infringes Plaintiff's common law rights in the mark. In support, Plaintiff argues that the USPTO determined that the mark is protectible when it issued a registration to Yaakov and that the mark is fanciful, and thus inherently distinctive and entitled to protection, because it was "selected for the purpose of functioning as a trademark and is without any dictionary meaning." (Pl.'s Mem. 12–13; Pl.'s Reply 14–17.) Plaintiff also argues that the existence of the KaraoKing mark on the machines in question creates a likelihood of confusion as to the source of the machines. (*Id.*)

Defendants argue that Plaintiff has failed to prove it had a valid common law trademark because the KaraoKing mark is either generic and thus not protectible or descriptive and Plaintiff has not provided any evidence of secondary meaning, which is required for a descriptive mark to merit protection. (Margaliot Defs.' Mem. 6; Lisse Defs.' Mem. 19–20.) In support, Defendants note that an entry on UrbanDictionary.com defines "karaoking" as "the act of singing karaoke," which describes the use to which the machines are put. (Margaliot Defs.' Mem. 6; Lisse Defs.'

---

passing off. *See id.* Because Plaintiff is seeking a prohibitory injunction to maintain that state of affairs, the heightened standard does not apply. *See id.*

Mem. 19.)  In addition, Defendants argue that Plaintiff has submitted no evidence of a likelihood

of customer confusion.[6]  (Margaliot Defs.' Mem. 6, 10; Lisse Defs.' Mem. 20–22.)

In order to prevail on a trademark infringement claim, a plaintiff "must demonstrate that

(1) 'it has a valid mark that is entitled to protection' and that (2) the defendant's 'actions are

likely to cause confusion with [that] mark.'"  *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d

74, 84 (2d Cir. 2020) (alteration in original) (quoting *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89

F.3d 955, 960 (2d Cir. 1996)); *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 43

(2d Cir. 2020) (same); *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir.

2016) (same).

As to the first prong, "[a] certificate of registration . . . [is] prima facie evidence of the

validity of [a] registered mark," 15 U.S.C. § 1057(b), and creates a presumption that the mark is

---

[6]  Defendants also argue that Plaintiff must prove continuous use in a particular
geographic area.  (Margaliot Defs.' Mem. 6–7; Lisse Defs.' Mem. 17–18.)  However, Defendants
rely on inapposite cases and misstate the law.  *See, e.g.*, *Dudley v. HealthSource Chiropractic,
Inc.*, 883 F. Supp. 2d 377, 389–90 (W.D.N.Y. 2012) (relying exclusively on Third Circuit and
Sixth Circuit precedent for the proposition that the owner of a common law mark must show a
"zone of exclusivity").  *But see Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37
(2d Cir. 2016) ("It is not as if the senior user must prove a new claim of infringement for each
geographic area in which it seeks injunctive relief. . . . [T]he scope of the injunction should be
governed by a variety of equitable factors — the principal concern ordinarily being providing the
injured senior user with reasonable protection from the junior user's infringement.").
The Lisse Defendants raise additional arguments that (1) Plaintiff lacks standing to bring
this suit because Yaakov owned the federally registered mark at the time the suit was filed,
(2) Yaakov owns the mark because he was a partner of DJ Direct rather than an employee when
he registered the mark in his own name, as evidenced by his sharing of profits, and (3) Plaintiff
could not have obtained common law rights because it was the junior user of the mark, as
evidenced by the dates of first use on Yaakov's trademark registration (October 28, 2017) and
Plaintiff's registration (December 28, 2017).  (Lisse Defs.' Mem. 4–5, 16–18.)  These arguments
fail for numerous reasons, including that: (1) Plaintiff is asserting infringement of its common
law rights in the mark, (2) the record does not support a finding that Yaakov was a partner and,
even if it did, the mark would not therefore belong to Yaakov, *see Dev. Specialists, Inc. v. Akin
Gump Strauss-Hauer & Feld LLP*, 477 B.R. 318, 327 (S.D.N.Y. 2014) (explaining general
principles of partnership law), and (3) the record is clear that any use Yaakov made of the mark
prior to December of 2017 was on Plaintiff's behalf.

entitled to protection. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ("[R]egistered trademarks are presumed to be distinctive and should be afforded the utmost protection."). "[T]he general principles qualifying a mark for registration . . . are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a) [of the Lanham Act]." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Lyons P'ship, L.P. v. D & L Amusement & Entm't, Inc.*, 702 F. Supp. 2d 104, 113 (E.D.N.Y. 2010). "To be valid and protectible, a mark must be capable of distinguishing the products it marks from those of others." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999) (citing *Two Pesos, Inc.*, 505 U.S. at 768). "An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc.*, 505 U.S. at 769. "Inherent distinctiveness is assessed on a continuum from least to most distinctive, with the aid of categories usually called (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful, with marks in the last category considered the strongest." *Car-Freshner Corp. v. Am. Covers, Inc.*, 980 F.3d 314, 329 (2d Cir. 2020); *see also Two Pesos, Inc.*, 505 U.S. at 768 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)) (same). The Second Circuit has explained that:

> A mark is generic if it is a common description of products and refers to the genus of which the particular product is a species. A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put. A mark is suggestive if it merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.

*Lane Cap. Mgmt.*, 192 F.3d at 344. "Generic marks are not protectible." *Id.* Descriptive marks "are not inherently distinctive" and thus are only protected upon a showing that the mark has acquired "secondary meaning," *id.*, which is "determined by analyzing six factors: advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use," *Car-Freshner Corp.*, 980 F.3d at 329 (citing *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987)). Suggestive, arbitrary, and fanciful marks are inherently distinctive and thus automatically protected because "[t]heir intrinsic nature serves to identify a particular source of a product." *Lane Cap. Mgmt.*, 192 F.3d at 344.

As to the second prong, courts evaluate the likelihood of confusion using the test articulated in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), which balances a nonexclusive list of eight factors. *See Tiffany & Co.*, 971 F.3d at 84. The "*Polaroid* factors" include:

> (1) the strength of the trademark; (2) the degree of similarity between the plaintiff's mark and the defendant's allegedly imitative use; (3) the proximity of the products and their competitiveness with each other; (4) the likelihood that the plaintiff will "bridge the gap" by developing a product for sale in the defendant's market; (5) evidence of actual consumer confusion; (6) evidence that the defendant adopted the imitative term in bad faith; (7) the respective quality of the products; and (8) the sophistication of the relevant population of consumers.

*Id.* at 84–85 (first citing *Polaroid*, 287 F.2d at 495; and then citing *Starbucks Corp.*, 588 F.3d at 115). The "evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Id.* at 85 (quoting *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000)). "The pertinence of individual factors varies with the facts of the particular case." *Guthrie Healthcare Sys.*, 826 F.3d at 37.

Nevertheless, "it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995) (citing *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 214 (2d Cir. 1985)).

### 1. Plaintiff's mark is valid and entitled to protection

Yaakov's registration of the KaraoKing mark is prima facie evidence of the validity of the mark and creates a presumption that the mark is neither generic nor descriptive, as Defendants argue. *See Abercrombie & Fitch Co.*, 537 F.2d at 11; *Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 871. However, even without the benefit of this presumption, Plaintiff's "KaraoKing" mark appears to be suggestive and thus inherently distinctive and entitled to protection. As the pictures Plaintiff has provided indicate, (*see* Am. Compl. 2; Pl.'s Mem. 3), the letter "*K*" in "King" is capitalized, suggesting that "KaraoKing" is a portmanteau of the words "Karaoke" and "King," meant to suggest a superior karaoke machine. Indeed, the KaraoKing machine integrates features intended to make it superior to an average karaoke machine, including a disco ball and speakers, and Yaakov chose that name in part because having the word "King" in the name would "signify it was the best karaoke machine." (Yaakov Decl. ¶ 10.) In addition, the word KaraoKing appears beneath bars staggered to resemble both an audio spectrum display and a crown. *See Katz v. Modiri*, 283 F. Supp. 2d 883, 893 (S.D.N.Y. 2003) (finding "Juva" mark suggestive because it bore a linguistic "relationship to the rejuvenating qualities associated with a spa" and "[c]onnecting the name to the spa services requires imagination"). Therefore, Plaintiff's mark is suggestive and thus inherently distinctive and entitled to protection.

## 2.   A likelihood of confusion exists

The Court examines the *Polaroid* factors to determine if Defendants' use of the

KaraoKing mark is likely to cause confusion as to the source of the machines.

### A.   The strength of the mark

Plaintiff argues that its mark is strong because it is fanciful.  (Pl.'s Mem. 12–13.)

Defendants argue that Plaintiff's mark is weak because it is generic or descriptive at best.

(Margaliot Defs.' Mem. 6; Lisse Defs.' Mem. 19–20.)

The "strength" of a mark is a measure of its "tendency to identify the goods sold under

the mark as emanating from a particular, although possibly anonymous, source." *Patsy's Brand,*

*Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 217 (2d Cir. 2003) (quoting *Arrow Fastener Co.*, 59

F.3d at 391).  "[T]he strength factor is analyzed based on two components: "(1) the degree to

which [the mark] is inherently distinctive; and (2) the degree to which it is distinctive in the

marketplace." *Car-Freshner Corp.*, 980 F.3d at 329 (second alteration in original) (quoting

*W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993)).

This factor favors Plaintiff.  For the reasons discussed above, Plaintiff's mark is

suggestive and thus inherently distinctive and strong rather than generic or merely descriptive

and weak.  *See Katz*, 283 F. Supp. 2d at 893 ("[T]he [c]ourt finds the mark to be suggestive, and

while it is not accorded the maximum degree of protection . . . , the mark is nonetheless

inherently distinctive and strong.").

### B.   Degree of similarity

Plaintiff argues that "the marks at issue herein are identical" because Plaintiff's mark

appears on the goods sold by Defendants "and will be prominently displayed when the glued

label peels off."  (Pl.'s Mem. 13.)

Defendants argue that Plaintiff's KaraoKing mark is "nothing like" their Amasing mark, and that although Plaintiff's mark is on the products, "it is covered over" by the Amasing mark precisely "to avoid any allegation of confusion." (Lisse Defs.' Mem. 20–21.)

In considering the degree of similarity between the marks, a court should address two key questions: (1) "whether the similarity between the two marks is likely to cause confusion" and (2) "what effect the similarity has upon prospective purchasers." *Sports Auth.*, 89 F.3d at 962. "In deciding whether the marks are similar as used, [a court does] not look just at the typewritten and aural similarity of the marks, but [at] how they are presented in the marketplace." *Id.* Therefore, "[t]o apply this factor, courts must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the 'totality of factors that could cause confusion among prospective purchasers.'" *Louis Vuitton Malletier v. Dooney & Bourke, Inc*., 454 F.3d 108, 117 (2d Cir. 2006) (quoting *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005)).

This factor strongly favors Defendants. Although Plaintiff's mark exists on the machines in question, Defendants are not using Plaintiff's mark to signify that they are the source of KaraoKing products, and prospective purchasers are not able to see Plaintiff's mark because it is covered by Defendants' Amasing mark, which is not similar to the KaraoKing mark.

## C. The proximity of the products and their competitiveness

Plaintiff argues that the parties' goods directly overlap because they are "exactly the same" and compete on the same market — namely, Amazon.com. (Pl.'s Mem. 13.)

Defendants argue that there is no overlap because they do not use the KaraoKing mark to promote or sell their products and "[c]onsumers never see the KaraoKing trademark at the time of sale." (Lisse Defs.' Mem. 21 (citing Kraminer Decl. 8–9).)

In considering the proximity of the products, a court should "consider whether the two products compete with each other." *W.W.W. Pharm. Co.*, 984 F.2d at 573. "The proximity factor can apply to both the subject matter of the commerce in which the two parties engage and the geographic areas in which they operate." *Guthrie Healthcare Sys.*, 826 F.3d at 39. The focus of the product proximity inquiry is "the likelihood that customers may be confused as to the [s]ource of the products, rather than as to the products themselves." *McGregor–Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1134 (2d Cir. 1979), *superseded on other grounds by Fed. R. Civ. P. 52(a), as recognized in Cross Commerce Media, Inc. v. Collective Inc.*, 841 F.3d 155, 160 (2d Cir. 2016). In examining this factor, a court should compare all aspects of the products, including price, style, intended uses, target clientele, typical distribution channels, and others. *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 296 (S.D.N.Y. 2003).

This factor favors Plaintiff because the parties are direct competitors, the karaoke machines are "identical," (Jacbowitz Decl. ¶ 34), and both parties distribute their machines on Amazon.com, making it likely that a consumer seeing the machines would be confused as to their source.

### D.   Likelihood that Plaintiff will "bridge the gap"

Plaintiff argues that, because the goods are identical, there is no gap to bridge. (Pl.'s Mem. 13.) Defendants do not address this factor.

"This factor looks to either the likelihood that [a plaintiff] will enter [a defendant's] business or to the average customer's perception of the likelihood that the plaintiff would enter the defendant's market. *Sports Auth.*, 89 F.3d at 963. However, because the parties' products "are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant . . . in this case." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005).

### E.    Evidence of actual consumer confusion

Plaintiff argues that this factor either is irrelevant or favors Plaintiff.  (Pl.'s Mem. 13.)

Defendants argue that Plaintiff has not presented any evidence of actual confusion and that Plaintiff's "failure to submit a survey showing the existence of customer confusion is evidence that likelihood of confusion cannot be proven."  (Margaliot Defs.' Mem. 11 (first citing *Mattel, Inc. v. Azrak–Hamway Int'l, Inc.*, 724 F.2d 357, 361 (2d Cir. 1983) (per curiam); and then citing *Universal City Studios, Inc. v Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984)); Lisse Defs.' Mem. 21 (same).)

"For purposes of the Lanham Act, actual confusion means 'consumer confusion that enables a seller to pass off his goods as the goods of another.'"  *Sports Auth.*, 89 F.3d at 963 (quoting *W.W.W. Pharm. Co.*, 984 F.2d at 574).  "If the two marks have been in use over a substantial period of time without ever producing instances of confusion, this fact can support a junior user's contention that confusion is not likely."  *Guthrie Healthcare Sys.*, 826 F.3d at 44 (citing *McGregor–Doniger Inc.*, 599 F.2d at 1136).  "However, the absence of evidence of actual confusion does not necessarily prove anything, especially when there has been neither long nor significant experience of the two trademarks operating side-by-side in the same market."  *Id.*

This factor is neutral.  Although surveys showing the existence of actual consumer confusion have become a usual way of demonstrating a likelihood of confusion in cases where "consumer confusion is not otherwise obvious," *Mattel, Inc.*, 724 F.2d at 361 (affirming denial of preliminary injunction where the plaintiff had not undertaken such a survey and had "provided little other evidence demonstrating consumer confusion"), "[i]t is 'black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source,'" *Guthrie*

*Healthcare Sys.*, 826 F.3d at 45 (quoting *Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 875) (citing

*Arrow Fastener Co.*, 59 F.3d at 397 (stating that the issue of actual confusion is "not dispositive

of the question of likelihood of confusion")).  While Plaintiff's case "would of course be even

stronger if it had evidence of actual consumer confusion," the absence of such evidence does not

necessarily prove anything given that the parties' products have not been operating side-by-side

in the same market for very long.  *Guthrie Healthcare Sys.*, 826 F.3d at 44–45.

### F.   Evidence of bad faith

Plaintiff argues that this factor strongly favors it because the Lisse Defendants purchased

the machines with the assistance of Yaakov, whom they paid as an outside consultant, (Kraminer

Decl. ¶ 3), and were aware of Plaintiff's ongoing dispute with Shenzhen when they purchased

them, (Pl.'s Mem. 13).

Defendants argue that they did not act in bad faith because Shenzhen "permanently

covered up [Plaintiff's mark] and resold the goods" when Plaintiff "stiffed" Shenzhen and

because "[t]he covering of the old mark . . . was specifically conducted to *avoid* any allegation of

confusion."[7]  (Lisse Defs.' Mem. 21–22.)  In addition, Defendants aver that, prior to purchasing

the machines, they informed Shenzhen that they wanted to make sure Plaintiff did not own the

machines, in response to which Shenzhen attempted to contact Plaintiff and sent Plaintiff a

dunning letter.  (Kraminer Decl. ¶ 5.)  Defendants argue that they did not act in bad faith because

they only purchased the machines after Shenzhen's attempts to contact Plaintiff went

unanswered and Plaintiff failed to pay the balance for the machines.  (*Id.* ¶ 6.)

---

[7]  The Lisse Defendants cite a number of cases that stand for the proposition that there
can be no likelihood of confusion with a competitor's product where a product is clearly labeled
with the manufacturer's name.  (Lisse Defs.' Mem. 22 n.28.)  However, this is not a case where
the manufacturer labeled the products with the manufacturer's name but where one seller had a
manufacturer cover up a competitor's mark with its own mark for resale.

"In analyzing whether a defendant has acted in bad faith, the question is whether the defendant attempted 'to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products.'" *Tiffany & Co.*, 971 F.3d at 88 (quoting *Star Indus., Inc.*, 412 F.3d at 388). "Even where there is no direct evidence of intent, 'if there is additional evidence that supports the inference that the defendant sought to confuse consumers as to the source of the product, . . . the inference of bad faith may fairly be drawn." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 312 (2d Cir. 2013) (quoting *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 66 (2d Cir. 2000)).

Based on Defendants' submissions and because it appears that Plaintiff was unaware of Shenzhen's purported attempts to collect the balance owed on the remaining containers until at least April 8, 2020, and therefore did not respond to Shenzhen's March 11, 2020 dunning letter, the Court declines to infer bad faith and instead treats this factor as neutral.

### G.  Respective quality of the parties' products

Plaintiff argues that if Defendants' glued-on nameplate fell off of a machine, it would negatively impact Plaintiff's reputation because "[l]abels are not typically glued over existing trademarks on well-made products."  (Pl.'s Reply 10.)

Defendants argue that because the goods are from the same manufacturer, "they are exactly the same quality as Plaintiff's."  (Lisse Defs.' Mem. 23.)

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality."  *Arrow Fastener Co.*, 59 F.3d at 398 (citing *Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 875).  "Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product."

*Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993). When there is no difference in the quality of the products, the factor should thus be treated as neutral rather than as weighing in favor of the defendants. *Sly Mag., LLC v. Weider Publ'ns LLC*, 346 F. App'x 721, 723 (2d Cir. 2009).

Because the parties' products are identical apart from the glued-on nameplates, this factor either is neutral or, for the reason Plaintiff articulates, slightly favors Plaintiff.

### H.    Sophistication of the relevant consumer population

Plaintiff argues that this factor either is irrelevant or favors Plaintiff. (Pl.'s Mem. 13.) Defendants do not address this factor.

In considering this factor, a court must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *McGregor–Doniger Inc.*, 599 F.2d at 1137 (quoting R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 81.2, at 577 (3d ed. 1969)).

This factor slightly favors Plaintiff. As Plaintiff notes, "[t]he fact that there are two machines that look almost exactly alike . . . [may] result in users deciding to purchase a different product altogether." (Pl.'s Reply 9 (citing *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) ("[C]onfusion may cause purchasers to refrain from buying either product and to turn to those of other competitors.")).)

Despite the strength of Plaintiff's mark, the proximity of the products on the marketplace, and the other factors that slightly favor Plaintiff, the Court concludes based on the dissimilarity of the marks that Plaintiff has not established a likelihood of confusion. Plaintiff's theory is that Defendants' sale of machines bearing the KaraoKing mark constitutes an infringing use of the

KaraoKing mark. However, Defendants are not using the KaraoKing mark — they are covering it up with their Amasing mark, which does not resemble the KaraoKing mark. Therefore, although Plaintiff has established that its mark is suggestive and entitled to protection, Plaintiff has not established that Defendants are using the KaraoKing mark or another similar mark in a way that is likely to cause confusion, and thus Plaintiff has not established a likelihood of success on the merits of its direct trademark infringement claim.

### ii. Reverse passing off claim

False designation of origin claims under the Lanham Act include reverse passing off, "in which A sells B's product under A's name." *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir. 1994). A reverse passing off claim requires: "(1) that the [product] at issue originated with the plaintiff; (2) that [the] origin of the [product] was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin."[8] *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 131 (2d Cir. 2004) (alterations in original) (quoting *Softel, Inc. v. Dragon Med. & Sci. Comm'ns*, 118 F.3d 955, 970 (2d Cir. 1997)).

---

[8] The Margaliots assert that Plaintiff is required to "prove it had a *valid common law trademark* prior to the time Yaakov filed for [the] KaraoKing trademark." (Margaliot Defs.' Mem. 6.) Although the Court has already concluded that Plaintiff had a valid common law mark, the Court notes that this is not a required element of a reverse passing off claim. *See Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2016) ("Significantly, the plain language of § 43(a) does not require that a plaintiff possess or have used a trademark in U.S. commerce as an element of the [false designation of origin] cause of action."); *Corker v. Costco Wholesale Corp.*, No. 19-CV-0290, 2019 WL 5895430, at *5 (W.D. Wash. Nov. 12, 2019) ("The [c]ourt finds that [s]ection 43(a) provides a federal remedy for 'a false designation of origin' . . . without regard to the existence of a protectable trademark.").

### 1.   Products originated with Plaintiff

Plaintiff argues that the products at issue originated with it because Plaintiff "commissioned and ordered the goods to be made by its supplier . . . and assumed responsibility for their production."  (Pl.'s Mem. 10 (citing *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010)).)

Defendants argue that the products did not originate with Plaintiff because Plaintiff did not manufacture, design, or own the products.  (Lisse Defs.' Mem. 11–12.)

The Supreme Court has held that the phrase "origin of goods" in the Lanham Act "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp*., 539 U.S. 23, 37 (2003).  In so holding, the Supreme Court noted that while "the most natural understanding of 'origin' of 'goods' — the source of wares — is the producer of the tangible product sold in the marketplace," this concept "might be stretched . . . to include not only the actual producer[] but also the trademark owner who commissioned or assumed responsibility for ('stood behind') production of the physical product." *Id.* at 31–32.

Although, as Defendants argue, Plaintiff's supplier manufactured the tangible goods offered for sale in this case, the fact that Plaintiff ordered the machines in question to be built to its specifications and to bear the KaraoKing mark, (Jacobowitz Supp. Decl. ¶¶ 19, 27, 30), and that it provided customer service and support through its website, www.karaoking.net, (*id.* ¶¶ 36, 43), supports the conclusion that Plaintiff commissioned the machines and stood behind their production. *See Universal Furniture Int'l, Inc.*, 618 F.3d at 438 ("Although 'the most natural understanding of the "origin" of "goods" — the source of wares — is the producer of the tangible product,' origin may also encompass 'the trademark owner who commissioned or

assumed responsibility for ("stood behind") production of the physical product.'" (quoting *Dastar Corp.*, 539 U.S. at 31–32)).  Accordingly, because the Supreme Court has contemplated that the phrase "origin of goods" might be stretched to include the trademark owner who commissioned the goods and stood behind their production, Plaintiff has shown at least a serious question going to the merits on this point, if not a likelihood of success.  *See Dastar Corp.*, 539 U.S. at 31–32.

Defendants argue that Plaintiff did not originate the machines because Plaintiff did not design the machines.[9]  However, the Supreme Court made clear in *Dastar* that who designed the goods is irrelevant to who originated them for purposes of a reverse passing off claim under the Lanham Act.  *See id.* at 32 ("The consumer who buys a branded product does not automatically assume that the brand-name company is the same entity that came up with the idea for the product, or designed the product — and typically does not care whether it is.  The words of the Lanham Act should not be stretched to cover matters that are typically of no consequence to purchasers.").

---

[9] Defendants also argue that Plaintiff's reverse passing off claim is preempted by patent and copyright law.  (Lisse Defs.' Mem. 14 & nn.11–13.)  However, the cases Defendants cite are inapposite, as they stand for the proposition that state law unfair competition claims premised on a theory of reverse passing off of patented or copyrighted products are preempted by federal patent and copyright law — but the same is not true of Lanham Act claims for reverse passing off.  *See, e.g.*, *Adina's Jewels, Inc. v. Shashi, Inc.*, 442 F. Supp. 3d 766, 772 (S.D.N.Y. 2020) (finding state law unfair competition claim based on reverse passing off of jewelry preempted by Copyright Act); *Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 507 (S.D.N.Y. 2018) (finding state law unfair competition claim based on reverse passing off of patented product preempted by federal patent law).  *But see Waldman Publ'g Corp. v. Landoll, Inc.*, 848 F. Supp. 498, 504–05 (S.D.N.Y. 1994) (granting preliminary injunction on Lanham Act claim of reverse passing off of copyrighted book but finding unfair competition claim premised on the same theory preempted by Copyright Act), *vacated in part on other grounds*, 43 F.3d 775 (2d Cir. 1994); *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 454 (S.D.N.Y. 2014) ("[T]he Copyright Act does not fully preempt state law claims where the claims also seek to protect trademark rights.").

Defendants also argue that Plaintiff did not originate the machines because Plaintiff did not own the machines, reasoning that the concept of "origin" must include ownership because reverse passing off has been as described as "A selling B's product under A's name" and, "[p]lainly, 'B's product' occurs when B owns its product." (Lisse Defs.' Reply 1.) Relying on *Commodore Imports Corp. v. Hiraoka & Co.*, 422 F. Supp 628 (S.D.N.Y. 1976), and *Banff Ltd., v. Express, Inc.*, 921 F. Supp. 1065 (S.D.N.Y. 1995), Defendants argue that Plaintiff did not own the machines because Plaintiff failed to pay Shenzhen for them, therefore repudiating its contract with Shenzhen and causing the machines to become part of the public domain and thus available for purchase and resale under a different private label. (Lisse Defs.' Mem. 10.)

The Court is unable to find a basis in *Dastar* or the Second Circuit's precedents for reading an ownership requirement into the "origin" element of Plaintiff's claim. Rather, just as "[t]he consumer who buys a branded product does not automatically assume that the brand-name company is the same entity that came up with the idea for the product, or designed the product — and typically does not care whether it is," consumers are unlikely to care who owns the product. *See Dastar Corp.*, 539 U.S. at 32 ("The words of the Lanham Act should not be stretched to cover matters that are typically of no consequence to purchasers."); *Meeco Mfg. Co. v. Imperial Mfg. Grp.*, No. 03-CV-3061, 2005 WL 8172681, at *7 (W.D. Wash. July 7, 2005) (finding that the defendant engaged in reverse passing off when it "overlabeled" its remaining inventory of the plaintiff's products, which it had bought from the plaintiff, with its own private labels); *cf. Richard Feiner & Co. v. Larry Harmon Pictures Corp.*, 38 F. Supp. 2d 276, 280 (S.D.N.Y. 1999) (refusing to dismiss Lanham Act claim for reverse passing off where the defendants claimed they were the owners and licensors of the plaintiff's copyrighted film works).

In addition, Defendants' reliance on *Commodore* is misplaced. There, the plaintiff had ordered a substantial number of radios that the plaintiff had designed and that bore its trademark. *Commodore Imps. Corp.*, 422 F. Supp. at 629. The manufacturer built the radios, but for some reason the plaintiff cancelled its order, causing the manufacturer to go bankrupt, at which point the defendants purchased the radios from the manufacturer's creditors and covered the plaintiff's mark with metal stickers bearing their own mark. *Id.* at 629–30. The court found no false designation of origin because "[t]he radios . . . were all properly labelled with the names of the defendants who were selling them," and, "[w]hile the radios may have been originally manufactured for the plaintiff, the evidence indicate[d] that the plaintiff cancelled its order with the manufacturer and that the radios were subsequently sold by the creditors of the bankrupt manufacturer." *Id.* at 630. The court reasoned that because there was no design patent at issue in the case, the radios were in the public domain, and thus the defendants had a right to copy their design. *Id.* The court concluded that "if defendants were free to order exact copies of the radios with their own trademarks or names on them, then they were free to purchase those which plaintiff's manufacturer was left with after plaintiff cancelled its order." *Id.*

There is no evidence that Plaintiff in this case ever cancelled its order with Shenzhen. Rather, Plaintiff had paid a deposit on the machines in question and was apparently still trying to pay the balance and obtain them as of April 8, 2020, by which time Shenzhen had already resold them, unbeknownst to Plaintiff. (WhatsApp Messages.) Accordingly, even if Defendants had a right to copy the design of the machines, *Commodore* does not support their argument that they had a right to purchase and resell the machines in question. *See Commodore Imps. Corp.*, 422 F. Supp. at 630, 632 n.3 (citing *PIC Design Corp. v. Sterling Precision Corp.*, 231 F. Supp. 106,

114–15 (S.D.N.Y. 1964)) (suggesting that a different result might have obtained if the goods the defendants purchased had not been rejected by the plaintiff).

Defendants' reliance on *Banff* is similarly misguided. In *Banff*, a knitwear manufacturer brought copyright infringement and false designation of origin claims against a clothing retailer alleging that the retailer had copied a sweater design created by the knitwear manufacturer and falsely designated the origin of the copied sweaters by inserting its own label in the sweaters. 921 F. Supp. at 1072. The court found that "[b]y placing [its] label in the sweaters it sold, [the defendant] did not represent that it had designed these sweaters," only "that it had the right to sell [them]." *Id.* However, as one district court has found, "[t]he relevant holding of *Banff* is rather limited," as "[t]he court held that because it was common in the clothing industry for retailers to add their own labels, retailer labels do not express or are not understood by consumers as a designation of origin at all, and thus they cannot constitute false designations of origin." *Ecore Int'l, Inc. v. Downey*, No. 12-CV-2729, 2015 WL 127316, at *3 n.2 (E.D. Penn. Jan. 7, 2015). Although Defendants argue that their mark merely signifies that they have a right to sell the machines, Defendants are not clothing industry retailers, and their placement of their mark on the face of the machines is not analogous to a clothing retailer's addition of its own label inside a garment, as consumers are likely to understand the Amasing mark as a designation of origin.

Accordingly, Plaintiff has established a likelihood of success on this prong.

## 2. Origin of the product falsely designated

Plaintiff argues that Defendants falsely designated Plaintiff's product by offering for sale and selling KaraoKing machines relabeled with their Amasing trademark. (Pl.'s Mem. 11.)

Defendants argue that they did not falsely designate Plaintiff's product as their own because the machines were not "Plaintiff's products," as Shenzhen created and designed them and Defendants did not claim to have designed or originated them. (Lisse Defs.' Mem. 12–13.)

The Supreme Court explained in *Dastar* that "an entity makes a false designation of origin sufficient to support a reverse passing off claim only where it falsely represents the product's geographic origin or represents that it has manufactured the tangible product that is sold in the marketplace when it did not in fact do so." *Dastar Corp.*, 539 U.S. at 587; *see also Societe Des Hotels Meridien*, 380 F.3d at 131 ("The fact that it did not use any of [the plaintiff's] trademarks in the directories does not save [the defendant] from a reverse passing off claim, because it is precisely the removal of a competitor's trademark from a product that is the hallmark of such claims." (citing *Waldman Publ'g Corp.*, 43 F.3d at 780)); *HM Elecs., Inc. v. R.F. Techs., Inc.*, No. 12-CV-2884, 2013 WL 12073837, at *4 (S.D. Cal. Mar. 18, 2013) (finding that the plaintiff stated a claim for false designation of origin where it alleged that the defendant "replaced [p]laintiff's product casing with its own branded case," "concealing the origin of the internal components of the newly-branded product," and the "newly-branded product retain[ed] [p]laintiff's [Federal Communications Commission] number").

Plaintiff's sworn statement and pictures indicating that the Amasing label was glued over Plaintiff's KaraoKing label, concealing it (a fact not disputed by Defendants), demonstrate that Defendants falsely designated the origin of the products, as consumers would think Amasing originated the goods, not KaraoKing. (Jacobowitz ¶ 33; Am. Compl. 2); *see Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 262 (S.D.N.Y. 2000) (finding that a plaintiff who alleged an "affirmative misrepresentation of ownership in, *inter alia*, the video version of *Cats* and press

releases concerning the musical" sufficiently alleged that the origin of the product was falsely designated).

Accordingly, Plaintiff has established a likelihood of success on this prong.

### 3.  The false designation is likely to cause confusion

Plaintiff argues that consumer confusion is inherent in reverse passing off cases but that there is a likelihood of confusion even under the *Polaroid* factors.  (Pl.'s Mem. 11–12.)

Defendants argue that the *Polaroid* factors apply in reverse passing off cases, (Margaliot Defs.' Mem. 8–9), that Plaintiff did not submit any evidence demonstrating a likelihood of confusion under the *Polaroid* factors, (*id.* at 10; Lisse Defs.' Mem. 20–22), and that, in any event, the *Polaroid* factors do not support such a finding, (Lisse Defs.' Mem. 20–22).

The Second Circuit has not addressed whether the *Polaroid* factors apply to reverse passing off claims.  Several courts, including courts in this Circuit, have concluded that the *Polaroid* factors are irrelevant in reverse passing off cases because the likelihood of confusion is inherent in such claims.  *See, e.g.*, *Laura Laaman & Assocs., LLC v. Davis*, No. 16-CV-594, 2017 WL 5711393, at *6 (D. Conn. Nov. 27, 2017) ("As a general matter, however, courts have concluded that a party's attempt to pass off another party's product as its own satisfies the confusion requirement of the Lanham Act for an obvious reason — it represents a direct attempt to confuse a consumer about the origin of a product." (citing *Universal Furniture Int'l, Inc.*, 618 F.3d at 438–39)); *Target Advert., Inc. v. Miller*, No. 01-CV-7614, 2002 WL 999280, at *7 (S.D.N.Y. May 15, 2002) (finding *Polaroid* analysis unnecessary where "[the defendants] did not promote services similar to those of [the plaintiff] — instead, . . . they pretended to be [the plaintiff]"); *Waldman Publ'g Corp. v. Landoll, Inc.*, 848 F. Supp. 498, 503–04 (S.D.N.Y. 1994) ("But reverse passing off does not require [a *Polaroid*] analysis.  [The defendant] is not selling

its own product under a trademark . . . confusingly similar to that of the plaintiffs. [The defendant] has simply misappropriated [the plaintiff's] product and is selling it as its own, without any attribution of credit to the true sources. . . . It is inherent in [the defendant's] conduct that purchasers . . . will . . . mistakenly believe that [the defendant] created the adaptations."), *vacated in part on other grounds*, 43 F.3d 775 (2d Cir. 1994); *see also Universal Furniture Int'l, Inc.*, 618 F.3d at 438–39 ("When a 'defendant has taken the plaintiff's product and has represented it to be his own work,' it is 'difficult to imagine how a designation of origin of a product . . . could be more likely to cause confusion or mistake as to the actual origin of the product.'" (quoting *Johnson v. Jones*, 149 F.3d 494, 503 (6th Cir. 1998))); *Mid-List Press v. Nora*, 374 F.3d 690, 693 (8th Cir. 2004) ("It is difficult to imagine how the public would not be confused about the origin of [the defendant's product], when the [product] actually bore the [plaintiff's] trade name and ISBN number."); *Suntree Techs., Inc. v. EcoSense Int'l, Inc.*, 802 F. Supp. 2d 1273, 1284 (M.D. Fla. 2011) (noting that some factors are irrelevant in reverse passing off cases).

Defendants cite several cases for their assertion that the *Polaroid* factors apply to reverse passing off claims; however, only one of the cases cited involved the application of the *Polaroid* factors to a reverse passing off claim. *See Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, No. 02-CV-4090, 2003 WL 1090281, at *2 (S.D.N.Y. Mar. 10, 2003) ("As discussed in this [c]ourt's analysis of the *Polaroid* factors in [its] earlier opinion, [where the plaintiff had asserted various Lanham Act claims not including reverse passing off,] the likelihood of confusion is small [with regard to the plaintiff's newly raised claim of reverse passing off].") , *vacated and remanded*, 380 F.3d 126, 131 (2d Cir. 2004) (finding allegations sufficient to state a likelihood of confusion but not addressing *Polaroid* factors).

Although a likelihood of confusion as to source seems inherent in Defendants' conduct, a likelihood of confusion exists even under the more stringent *Polaroid* factors. As discussed above, Plaintiff's trademark infringement claim was premised on the theory that the existence of the covered-up KaraoKing mark on Defendants' machines creates a likelihood of confusion as to source. Therefore, while the strength of Plaintiff's mark and the proximity of the products weighed in Plaintiff's favor and most of the other factors were neutral or slightly favored Plaintiff, the fact that Defendants are not using the KaraoKing mark as a signifier of source precluded a finding that their "use" of the mark is likely to cause confusion. However, for purposes of Plaintiff's reverse passing off claim, the question is whether Defendants' covering up of the KaraoKing mark with their own Amasing mark is likely to cause confusion as to source, and the Court concludes that it is.

### 4. Plaintiff's harm by false designation

Plaintiff argues that, in reverse passing off cases, likelihood of confusion is strong evidence of irreparable harm to good will. (Pl.'s Mem. 14–15.) In addition, Plaintiff argues that Defendants are interfering with its ability to control its reputation, a harm that is "neither calculable nor precisely compensable" and which therefore amounts to irreparable harm. (*Id.* (quoting *Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 269 (E.D.N.Y. 2011)).).

Defendants argue that Plaintiff "has not shown any harm caused by the alleged [Amasing] designation" because Plaintiff "does not own the designs." (Lisse Defs.' Mot. 13.)

"Courts have generally required only minimal showings of harm by a party whose goods are passed off and sold by another." *Laura Laaman & Assocs., LLC*, 2017 WL 5711393, at *6; *see, e.g., Pop Bar, LLC v. Fellows*, No. 12-CV-6647, 2013 WL 4446227, at *6 (S.D.N.Y. Aug.

19, 2013) (finding the plaintiff's "aver[ment] that its goodwill and reputation have been affected" sufficient to state a claim for reverse passing off); *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 259 (S.D.N.Y. 2000) ("The harm caused by reverse passing off is that the originator of the product is 'involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product.'" (quoting *Rosenfeld v. W.B. Saunders*, 728 F. Supp. 236, 241 (S.D.N.Y. 1990))); *see also Universal Furniture Int'l, Inc.*, 618 F.3d at 439 (same).

Plaintiff has established it is likely to succeed on this prong given the strong likelihood of confusion and consequent negative effects to its good will and reputation caused by Defendants' relabeling of Plaintiff's machines with their own mark and selling them on the same platform.

Based on the foregoing, Plaintiff has established a likelihood of success on the merits of its reverse passing off claim.

### c.  Irreparable harm

Plaintiff argues that where, as here, a Lanham Act plaintiff has succeeded in showing a likelihood of confusion, irreparable injury "almost inevitably follows." (Pl.'s Mem. 14 (quoting *Omega Importing Corp.*, 451 F.2d at 1195).)  In addition, Plaintiff argues that "[i]n a case of reverse passing off, irreparable harm naturally flows from the loss of sales and loss to business reputation that are not precisely quantifiable when a defendant sells a product originating from the plaintiff yet asserts that the product originates from the defendant." (Pl.'s Reply 7–10 (citing *Arrow United Indus. v. Hugh Richards, Inc.*, 678 F.2d 410 (2d Cir. 1982)).)  Plaintiff also asserts that "[h]ere, just as in *Arrow*, [Plaintiff] is being irreparably harmed . . . by the reality that [it] is not the only source of the particular karaoke machine now being sold on Amazon, which [it] had

designed through its own efforts and contributions over a considerable period of time." (*Id.* at 9.)

The Margaliots have not responded to this argument. (Margaliot Defs.' Mem. 11 (arguing that Plaintiff failed to show that its use of the mark is protected and that the remaining prongs of the preliminary injunction analysis are therefore moot).) The Lisse Defendants argue that "Plaintiff has presented no evidence of irreparable harm," that its "loss of sales was not due to any acts of Lisse" but to Plaintiff running out of inventory "because it did not pay its factory," and, in any event, "that Plaintiff's sales are now increasing again." (Lisse Defs.' Mem. 22.) Defendants further argue that lost sales are compensable through monetary damages, making injunctive relief inappropriate, and that Plaintiff "provides no evidence of any loss of goodwill" other than its assertion that "Defendant's conduct . . . [will] tarnish DJ Direct's invaluable goodwill," but "there is no tarnishment" because "the goods are . . . the same quality." (*Id.*)

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Yang*, 960 F.3d at 128 (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). To establish irreparable harm, "[p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB*, 559 F.3d at 118 (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). Absent "extraordinary circumstances," injunctions are also unavailable "[w]here there is an adequate remedy at law, such as an award for money damages." *Id.* (quoting *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005)). Courts have "found irreparable harm where a party is

threatened with the loss of a business," particularly when the "very viability" of the business is at risk. *Tom Doherty Assocs. Inc.*, 60 F.3d at 37–38.

In trademark disputes, "a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm." *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005); *see also Really Good Stuff, LLC*, 813 F. App'x at 44 ("The loss of reputation and goodwill constitutes irreparable harm." (citing *Register.com, Inc. v. Verio, Inc*., 356 F.3d 393, 404 (2d Cir. 2004))); *McGraw-Hill Cos. v. Ingenium Techs. Corp.*, 364 F. Supp. 2d 352, 355 (S.D.N.Y. 2005) ("In a trademark action, a showing of confusion as to the source of a product ordinarily will establish that a risk of irreparable harm exists as to the reputation of the trademark sought to be protected." (quoting *Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 109 (2d Cir. 1986))).

Although Plaintiff's allegation that its "gross sales" have declined is insufficient to establish irreparable harm,[10] Plaintiff has established a likelihood of confusion flowing from Defendants' relabeling of its machines causing unquantifiable harm to its reputation and good will. Therefore, Plaintiff has established irreparable harm. *See HM Elecs., Inc. v. R.F. Techs., Inc*., No. 12-CV-2884, 2013 WL 12074966, at *9 (S.D. Cal. Oct. 3, 2013) (finding that "[the plaintiff] . . . demonstrated that [the defendant's] alleged infringement and the customer confusion that accompanies it, are likely to damage [the plaintiff's] reputation and goodwill among its customers" in a reverse passing off case).

---

[10] *See CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 781 (2d Cir. 2010) ("We have long held that an injury compensable by money damages is insufficient to establish irreparable harm."); *Sunni, LLC v. Edible Arrangements, Inc.*, No. 14-CV-461, 2014 WL 1226210, at *10 (S.D.N.Y. Mar. 25, 2014) ("Lost profits are quintessentially compensable damages, and it is well-established that '[l]ost profits alone are not sufficient to show irreparable harm.'" (quoting *Freeplay Music, Inc. v. Verance Corp.*, 80 F. App'x 137, 138 (2d Cir. 2003))).

### d. Balance of hardships

Plaintiff argues that the balance of hardships favors an injunction because the harm to Plaintiff's reputation "far outweighs whatever effect Defendants would experience from being temporarily barred from selling misbranded products that confuse[] consumers." (Pl.'s Mem. 16.)

The Margaliot Defendants have not responded to this argument. The Lisse Defendants argue that the balance of hardships "plainly" tips in Lisse's favor because Plaintiff's sales are ongoing, whereas it is the holiday season for Lisse. (Lisse Defs.' Mem. 24.)

Under the third prong, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Yang*, 960 F.3d at 135 (quoting *Winter*, 555 U.S. at 24). "Plaintiffs must establish that the balance of hardships tips in their favor regardless of the likelihood of success." *Martinez v. Cuomo*, 459 F. Supp. 3d 517, 526–27 (S.D.N.Y. 2020) (citing *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010)).

Given the harm Plaintiff has demonstrated, the balance of hardships tips in Plaintiff's favor. Defendants' arguments to the contrary are unpersuasive. First, ongoing sales and harm to reputation and good will resulting from reverse passing off are not mutually exclusive. Second, the holiday season affects all retailers — not just Defendant — therefore, Defendants' argument applies with equal force to Plaintiff. Accordingly, the balance of hardships tips decidedly in Plaintiff's favor.

### e. Public interest

Plaintiff argues that "an injunction would serve the public interest by halting the sale of a misbranded product and protecting consumers from confusion." (Pl.'s Mem. 16.) Defendants do not argue that an injunction would harm the public interest.

In analyzing the public interest prong, a court must consider "the public consequences in employing the extraordinary remedy of injunction" and ensure that the proposed injunction will not harm the public interest. *Yang*, 960 F.3d at 135–36 (quoting *Winter*, 555 U.S. at 24); *SEC v. Citigroup Global Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012). There is no indication that granting an injunction would harm the public interest.

Based on the foregoing, the Court grants Plaintiff's motion for a preliminary injunction pursuant to its reverse passing off claim.

### f. Plaintiff is not required to post a bond

The Lisse Defendants argue that, if an injunction is entered, the Court should require Plaintiff to post a $270,000 bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, which sum represents Lisse's estimated lost profits, based on inventory and current sales, as a result of an injunction. (Lisse Defs.' Mem. 24 (citing Kraminer Decl. ¶ 15).)

Plaintiff argues that the Court should not require it to post a bond because it has established that it is "extremely likely" to succeed on the merits, (Pl.'s Reply 18), and because there is "no proof of likelihood of harm" to Defendants.

Rule 65(c) of the Federal Rules of Civil Procedure states that "the court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The phrase 'in such sum as the court deems proper' indicates that the District Court is vested with wide discretion in the matter of security[,] and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm . . . ." *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (quoting *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961)) (citing *Clarkson Co. v. Shaheen*, 544 F.2d

624, 632 (2d Cir. 1976) (holding that courts have discretion not to require bond)); *Doctor's Assocs. LLC v. Hai*, No. 19-CV-1968, 2019 WL 2385597, at *5 (E.D.N.Y. June 6, 2019) ("[A] district court in its discretion may deny a bond altogether if there is 'no proof of likelihood of harm' to the non-movant." (alteration in original) (quoting *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013))).

Although the Lisse Defendants argue that an injunction would cause them to lose $270,000 in sales and that this harm could be permanent because it is hard for a seller to regain momentum once it stops selling on Amazon.com, they do not offer any support for these claims apart from Kraminer's assertions in his declaration. In addition, an order enjoining Defendants from selling KaraoKing-branded machines relabeled with their mark would not prohibit them from selling other products, and they do not argue that their business's survival is at stake. Accordingly, the Court declines to require Plaintiff to post a bond.

### III. Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion for a preliminary injunction as to Plaintiff's reverse passing off claim and denies Plaintiff's motion as to its trademark infringement claim. Defendants are enjoined from selling KaraoKing-branded products relabeled as Amasing products.

Dated: January 8, 2021
      Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge